RALPH Y. KOMATSU, Appellant-Appellee, *v.* BOARD OF TRUSTEES, EMPLOYEES' RETIREMENT SYSTEM, STATE OF HAWAII, Appellee-Appellant

NO. 9582

(CIVIL NO. 75154)

AUGUST 22, 1984

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

The Board of Trustees of the Employees' Retirement System, State of Hawaii (Board), appeals from the circuit court's order and judgment reversing the Board's decision and ordering the Board to grant to Ralph Y. Komatsu (Komatsu) service-connected occupational disability retirement benefits under Hawaii Revised Statutes (HRS) § 88-79 (1976).

The general question is whether the circuit court was right in reversing the Board's decision which denied Komatsu's application for HRS § 88-79 benefits. The specific question is whether Komatsu's permanent incapacitation for duty caused by asthmatic bronchitis was either "the cumulative result of some occupational hazard" or "the natural and proximate result of an accident occurring while in the actual performance of duty" within the meaning of HRS § 88-79(a).[1] We answer no to both questions and reverse.

---

[1] The Board also raises the question of whether the circuit court abused its discretion in awarding costs to Komatsu. Our disposition of the appeal renders this question moot.

Komatsu was born on August 30, 1915 and was employed as an executive assistant to a physician of the Department of Health, City and County of Honolulu, from 1969 to October 16, 1981 when his services were terminated. He initially was stationed at the Maluhia Hospital, but moved to the Pawaa Annex building about 1974. Other than experiencing frontal headaches and nasal stuffiness, he had no respiratory problems prior to his moving to the Pawaa Annex.

On March 25, 1980, Komatsu applied for service-connected occupational disability retirement claiming that he was permanently incapacitated for further duty as a result of an accident, a "bronchial attack," occurring on April 21, 1977, which was "due to the work environment (improper air condition system where [there was] no movement of air)." Board's Record at 347. The April 21, 1977 "accident" was a severe coughing spasm with difficulty in breathing suffered by Komatsu at night while he was in bed at home.

The Medical Board of the Employees' Retirement System (Medical Board) certified that Komatsu was incapacitated for further performance of duty but that the incapacitation was non-service-connected. In his appeal from the Medical Board's decision, Komatsu asserted that his incapacitation was "the natural and proximate cumulative result of the environment at his work place." Board's Record at 367.

After conducting evidentiary hearings, the hearing officer recommended to the Board that it determine that Komatsu's permanent incapacitation for duty was service-connected. The Board rejected the hearing officer's recommended decision and denied Komatsu's application.

Komatsu appealed to the circuit court which reversed the Board's decision. The Board's timely appeal followed.

I.

The relevant portion of HRS § 88-79(a) reads as follows:
[A]ny member who has been permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite

time and place, or as the cumulative result of some occupational hazard, through no willful negligence on his part, may be retired by the board of trustees for service-connected occupational disability[.]

There is no dispute that Komatsu's asthmatic bronchitis rendered him permanently incapacitated for duty and that such incapacitation was not through "willful negligence on his part." Regarding causation, the Board found that the "poor circulation from the air conditioning system of the mold contaminants . . . caused [Komatsu's] respiratory dysfunction[.]" Board's Record at 626. The circuit court impliedly determined that the Board's finding was not clearly erroneous by stating that the cumulative effect of the molds or fungi from the air conditioning system circulating in his office caused Komatsu's incapacitation.

The dispute then is whether the causation was either "the cumulative result of some occupational hazard" or "the natural and proximate result of an accident occurring while in the actual performance of duty" within the meaning of HRS § 88-79(a).

II.

Komatsu contends, in essence, that (1) his "occupation" was that of an office worker, (2) office workers are subjected to high concentrations of fungi from air conditioning in their offices, (3) the fungi or mold contaminants from the air conditioning system circulating in his office caused his asthmatic bronchitis which resulted in his incapacitation, and (4) consequently, his permanent incapacitation for duty was the cumulative result of an "occupational hazard." We cannot agree.

Although HRS chapter 88 contains no definition of the term "occupational hazard," our supreme court has defined the term:

An occupational hazard is a danger or risk which is inherent in, and concomitant to a particular occupation. *Cf. Detenbeck v. General Motors Corporation*, 309 N.Y. 588, 132 N.E.2d 840 (1956). To be considered an occupational hazard, the causative factors must be those which are not ordinarily incident to employment in general and must be different in character from those found in the general run of occupations. *Fruehauf Corp., Etc. v. Work-*

*men's Compensation,* 31 Pa. Commw. Ct. 341, 376 A.2d 277 (1977).

*Lopez v. Board of Trustees, Employees' Retirement System,* 66 Haw. 127, 129, 657 P.2d 1040, 1042 (1983). *Lopez* involved service-connected total disability retirement under HRS § 88-77(a) (1976),[2] which is almost identical in language to HRS § 88-79(a). Thus, the definition of "occupational hazard" in *Lopez* is applicable in the construction of HRS § 88-79(a).

### A.

Before deciding whether a particular working condition is an "occupational hazard," a determination of the pertinent occupation is necessary. Komatsu asserts that his occupation was that of an "office worker." The Board argues that the generic class of office workers is overly expansive and that Komatsu's occupation was that of "an executive assistant . . . or, at most, a government administrator."

For the purpose of this opinion, we will consider Komatsu's occupation was that of an office worker.

### B.

In *Lopez,* the applicant for service-connected total disability retirement benefits was an industrial safety engineer with the State Department of Labor. There was evidence that "the stress and job pressures he experienced in his employment over a period of years had contributed to his disability." *Id.* at 128, 657 P.2d at 1041. However, the Board, the circuit court, and the supreme court agreed that his incapacitation was not "the cumulative result of some occupational hazard" within the meaning of HRS chapter 88.

---

[2] HRS § 88-77(a) provides in pertinent part:

[A]ny member who has been permanently incapacitated as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, or as the cumulative result of some occupational hazard, through no willful negligence on his part, may be retired by the board of trustees for service-connected total disability[.]

Interestingly, the *Detenbeck* and *Fruehauf Corp.* cases cited in *Lopez* are workers' compensation cases involving claims based on alleged "occupational diseases." In *Detenbeck*, the New York court held that the back disability of an industrial plant employee who had a congenital defect of the spine was not an "occupational disease" since the nature of his employment was not such as to have a tendency to induce a similar malady in the average workman. In *Fruehauf*, the Pennsylvania court ruled that an arc welder who contracted pneumoconiosis had an "occupational disease" because he had proved that "the disease is causally related to the industry or occupation and that the incidence of the disease [was] substantially greater in the industry or occupation than in the general population," and that he had been exposed to such hazard. 31 Pa. Commw. at 348, 376 A.2d at 280. Thus, *Lopez* teaches that "occupational hazard" means, in effect, a hazard peculiar to an occupation which, upon repeated and cumulative exposure to it, will result in a disease causally related to the occupation.

In another New York case, cited in *Detenbeck*, the court stated that:

> [A]n occupational disease is one "which results from the nature of the employment, and by nature is meant * * * conditions which all employees of a class are subject, and which produce the disease as natural incident of a particular occupation, and attach to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of the hazard attending employment in general.

*Harman v. Republic Aviation Corp.*, 298 N.Y. 285, 288, 82 N.E.2d 785, 786 (1948) (quoting *Goldberg v. 954 Marcy Corp.*, 276 N.Y. 313, 318-19, 12 N.E.2d 311, 313 (1938)). Also, in *McHale v. Workmen's Compensation Appeals Board*, 56 Pa. Commw. 344, 348, 425 A.2d 34, 36 (1981), the court stated that to qualify as an "occupational disease" there must be proof that the incidence of the claimant's disabling condition of bronchitic asthma "is substantially greater in that industry or occupation than in the general population."

Our review of the record discloses that Komatsu failed to meet these tests. There is no substantial evidence proving that (1) office workers in general were subjected to equivalent amounts of mold contaminants or fungi from air conditioning systems as was Komatsu in his office, (2) the average office worker has a tendency

to contract asthmatic bronchitis because of mold contaminants or fungi in the air conditioning system, and (3) the incidence of asthmatic bronchitis is substantially greater among office workers than the general population.

The evidence shows that Komatsu's office was a small self-contained room with poor air circulation; that three allergenic fungi — penicillium oxalicum, aspergillus ochraceus, and cladosporium cladosporoides — were present in the air conditioning vents and ceiling in the office; that the fungi grew as a slime layer of wet material on the filter and were released in the office by the air-flow system; that Komatsu had an underlying allergic predisposition and medical tests disclosed his sensitivity to those fungi; that although he was sensitive to other allergens, being exposed to a high concentration of the allergenic fungi in his office environment sensitized Komatsu to the fungi in the form of asthmatic bronchitis; and that once sensitized, low concentration of the fungi or other allergens would trigger the sensitization. The evidence discloses that the secretary in the same office became afflicted with some sort of respiratory ailment. There is no evidence, however, that office workers in other parts of the Pawaa Annex building suffered asthmatic bronchitis or other respiratory illness caused by the air conditioning system. Nor is there any evidence of the incidence of asthmatic bronchitis or other respiratory ailments in office workers in general.

Dr. Bruce A. Soll, a specialist in internal medicine and pulmonary diseases, testified that "in order to produce the sort of disease that [Komatsu] has, you have to be a susceptible individual, you have to be of an allergic predisposition." Board's Record at 89. He further testified:

> We all might have the good fortune of not having sensitive bodies and lungs as [Komatsu] does have. So that if you have a whole population of employees and they are not sensitive to that [fungus] then it poses no substantial health hazards for your individuals as long as I know that. But if you have one or two people like [Komatsu] in the office, then that's different. It's a health hazard.

Board's Record at 103.

At best, the evidence shows that Komatsu's employer failed to

furnish him with a proper and safe place in which to work, considering his allergic predisposition.[3] *See Harman v. Republic Aviation Corp., supra.* It does not support a finding or conclusion that asthmatic bronchitis is a "danger or risk which is inherent in, and concomitant to" the occupation of office workers. *Lopez, supra.*

Consequently, we hold that Komatsu's permanent incapacitation for duty caused by asthmatic bronchitis was not the cumulative result of an "occupational hazard" within the meaning of HRS § 88-79(a).

### III.

Komatsu further claims that, if his permanent incapacitation was not the cumulative result of an "occupational hazard," the circuit court was nevertheless correct since the incapacitation was caused by "an accident occurring while in the actual performance of duty at some definite time and place" within the meaning of HRS § 88-79(a). He asserts that the circuit court's correct decision should be affirmed despite its wrong reasoning. *Agsalud v. Lee,* 66 Haw. 425, 664 P.2d 734 (1983). He argues that (1) he was "bombarded by the high concentration of molds . . . during the hours he was at work at the Pawaa Annex"; (2) such bombardments resulted in "a very serious asthmatic bronchitis attack at home on April 21, 1977, as well as a number of other attacks at work"; and (3) therefore, his incapacitation was an "accident" within the meaning of HRS § 88-79(a). We disagree.

In *Lopez,* the supreme court stated that "[a]n accident is an unlooked for mishap or untoward event which is not expected or designed," stressed the fact that under the retirement statute the accident must occur "while in the actual performance of duty at *some definite time and place,*" and held that the applicant's condition was not the result of an "accident." 66 Haw. at 131-32, 657 P.2d at 1043 (emphasis in original). The fungi or molds which assailed Komatsu from the air conditioning system over a course of time are more like the "work pressures and stresses over a period of time"

---

[3] Komatsu did apply for and receive workers' compensation benefits. *See* Board's Record at 484-87.

which contributed to the applicant's mental infirmity in *Lopez.* 66 Haw. at 131, 657 P.2d at 1043. As in *Lopez,* we find no "unlooked for mishap or untoward event" which occurred to Komatsu at some definite time and place while he was in the actual performance of duty as required under HRS § 88-79(a).

*Kikuta v. Board of Trustees, Employees' Retirement System,* 66 Haw. 111, 657 P.2d 1030 (1983), discusses the kind of causation which qualifies as an "accident." In *Kikuta,* an unprovoked assault was considered an "accident" since it occurred during work at a single time. The supreme court stated that "an assault may be an accident . . . when from the point of view of the injured workman, it is unexpected and without design on his part, although intentionally caused by another." *Id.* at 114, 657 P.2d at 1033.

Citing *Dunlap v. Industrial Commission,* 90 Ariz. 3, 363 P.2d 600 (1961) (employee's pneumonia was caused by an "accident"), and *Mead v. American Smelting & Refining Co.,* 1 Ariz. App. 73, 399 P.2d 694 (1965) (employee's bronchial asthma and emphysema were the results of an "accident"), Komatsu argues that diseases, particularly respiratory problems, fall within the term "accident" and that "the terms 'disease' and 'accident' are no longer considered mutually exclusive." Those cases are not convincing, however, for they are workers' compensation cases and Arizona's workers' compensation statute is deemed "remedial and its terms [are] liberally construed." *Dunlap v. Industrial Commission,* 90 Ariz. at 6, 363 P.2d at 602.

*Zavaglia v. Contributory Retirement Appeal Board,* 345 Mass. 483, 188 N.E.2d 147 (1963), which Komatsu urges us to follow, held that an employee's bronchial asthmatic condition due to extended exposure to dust and dirt was a "personal injury" under the retirement statute. The Massachusetts court found a legislative intent to broaden the coverage of "personal injury" to include injury "of a cumulative nature" and ruled that the "personal injury need not be the product of a single event." *Id.* at 487, 188 N.E.2d at 150.

In HRS § 88-79(a), however, we perceive a legislative intent to consider permanent incapacitation for duty either as a result of an "accident" or as the "cumulative result of some occupational hazard" to be mutually exclusive.

Prior to the enactment of Act 225, 1965 Haw. Sess. Laws 355, Revised Laws of Hawaii § 6-46.1 (Supp. 1963) (the predecessor of

HRS § 88-79) provided for occupational disability retirement benefits only for a member who was permanently incapacitated for duty as a result of an "accident." Act 225 added the clause "or as the cumulative result of some occupational hazard" in the first paragraph and a new paragraph (the first paragraph of current HRS § 88-79(b)) which provided as follows:

> In the case of firemen, the cumulative effect of the inhalation of smoke, toxic gases, chemical fumes and other toxic vapors on the heart, lungs and respiratory system shall be construed as an injury received or disease contracted while in the performance of their duty and as the cumulative result of some occupational hazard for the purpose of determining occupational disability retirement under this section.

Act 225, § 2, 1965 Haw. Sess. Laws 355-56. The legislative committee reports refer only to firemen and no other governmental employees. *See* Hse. Stand. Comm. Rep. No. 893, in 1965 House Journal, at 771; Sen. Stand. Comm. Rep. No. 249, in 1965 Senate Journal, at 909.

In 1971, the legislature amended HRS § 88-79(b) to include sewer workers with the firemen. Act 152, § 3, 1971 Haw. Sess. Laws 348. The legislative committee reports mention firemen and sewer workers only. *See* Hse. Stand. Comm. Rep. No. 143, in 1971 House Journal, at 738; Sen. Stand. Comm. Rep. No. 723, in 1971 Senate Journal, at 1119. In 1974, HRS § 88-79(b) was amended again by adding a second paragraph to create a presumption for retirement purposes in favor of firemen and sewer workers. Act 182, § 3, 1974 Haw. Sess. Laws 391, 393-94.

Thus, the legislature has never considered the "cumulative result" test to be synonymous with "accident." Moreover, its intent was to limit such a test to causations similar to those enumerated in HRS § 88-79(b) as applied to the occupations of firemen and sewer workers.

As shown above, the legislature has maintained a dichotomy regarding causes for permanent incapacitation for duty — "result of an accident" and "cumulative result of some occupational hazard." Where an incapacitating condition or disease results from the cumulative effect of causative factors, it cannot be a result of an "accident" under HRS § 88-79(a).

We therefore hold that Komatsu's permanent incapacitation for

duty was not the "natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place" within the meaning of HRS § 88-79(a).

## IV.

We conclude that the circuit court was wrong in reversing the decision of the Board. *See Outdoor Circle v. Harold K.L. Castle Trust Estate,* 4 Haw. App. 633, 675 P.2d 784 (1983), *cert. denied,* 67 Haw. 1, 677 P.2d 965 (1984). Accordingly, we reverse the order and judgment of the circuit court and remand for entry of a judgment in favor of the Board.

Reversed and remanded for further proceedings in accordance herewith.

*Harriet Yoshida Lewis,* Deputy Attorney General, for appellee-appellant.

*Jeffrey S. Portnoy (Milton M. Yasunaga* with him on the brief; *Cades Schutte Fleming & Wright,* of counsel) for appellant-appellee.